# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RICHARD B.,

     **Plaintiff,**

     **v.**                          **Case No. 24-CV-1364**

**FRANK BISIGNANO,**
**Commissioner of Social Security,**

     **Defendant.**

## DECISION AND ORDER

Richard B. (hereinafter "Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title XVI application for supplemental security income. For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

On August 9, 2018, Plaintiff filed a Title XVI application for supplemental security income alleging disability beginning on January 1, 2018 due to autism spectrum disorder. (Tr. 348, 388.) Plaintiff's claims were denied initially on January 7, 2019, and upon reconsideration on August 23, 2019. (Tr. 32.) Plaintiff filed a request for a hearing, and a telephone hearing was held before Administrative Law Judge ("ALJ") Jessica Hodgson on October 25, 2023. (Tr. 54–108.) Plaintiff, who was represented by counsel, testified at the hearing, as did Frank Samlaska, a vocational expert ("VE"). (*Id.*)

In a written decision dated January 29, 2024, ALJ Hodgson found that Plaintiff had the severe impairments of an adjustment disorder, autism spectrum disorder, major depressive disorder, attention deficit hyperactivity disorder, and anxiety. (Tr. 34–35.) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 35–37.) In assessing the "paragraph B" criteria of Listings 12.04, 12.06, 12.10, and 12.11, the ALJ concluded that Plaintiff had mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.*)

ALJ Hodgson found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: able to perform simple, routine tasks and make simple work-related decisions and frequently interact with supervisors, co-workers, and the public. (Tr. 37–43.)

Plaintiff has no past relevant work and was 21 years old on the date the application was filed. (Tr. 43.) Despite having no past relevant work, ALJ Hodgson found that given Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that he could perform. (Tr. 44.) As such, the ALJ concluded that Plaintiff was not disabled since August 9, 2018, the application date. (Tr. 44–45.)

The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (Tr. 17–21.)

## DISCUSSION

1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal

standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

   2.   *Application to this Case*

Plaintiff argues his RFC fails to encapsulate his limitations in mental functioning, particularly due to his autism spectrum disorder. I agree that ALJ Hodgson erred in her RFC assessment and thus remand is required.

### 2.1 Plaintiff's History of Autism

While ALJ Hodgson determined Plaintiff suffered from multiple severe impairments, the record supports that the fundamental impairment causing Plaintiff's alleged limitations is his autism spectrum disorder. Autism is described as:

> A mental disorder characterized by severely abnormal development of social interaction and of verbal and nonverbal communication skills. Affected people may adhere to inflexible, nonfunctional rituals or routines. They may become upset with even trivial changes in their environment. They often have a limited range of interests but may become preoccupied with a narrow range of subjects or activities. They appear unable to understand others' feelings and often have poor eye contact with others. Unpredictable mood swings may occur. Many demonstrate stereotypical motor mannerisms such as hand or finger flapping, body rocking, or dipping. The disorder is probably caused by organically based central nervous system dysfunction, especially in the ability to process social or emotional information or language.

Stedman's Medical Dictionary, Autism (updated Nov. 2014). Plaintiff was not officially diagnosed with autism until November 2018, when he was 21 years old. (Tr. 510.) In December of the previous year, however, Plaintiff's father took him to family physician Dr. Andrew Snider with concerns about his son's lack of ambition. (Tr. 465.) He stated that Plaintiff slept all of the time or played video games, had no friends, and had no interest in pursuing work or higher education. (*Id.*) Dr. Snider concluded that Plaintiff suffered from apathy and anhedonia and would benefit from counseling. (Tr. 467.)

Plaintiff was initially referred to Tanya Zaloudek, LPC for counseling. On January 11, 2018, she conducted an assessment in which she noted that Plaintiff had no vision or expectations of what he wanted to do with his life and seemed content playing video games and not working. (Tr. 478–80.) She diagnosed him with an adjustment disorder and stated that he seemed to put more effort into avoiding adult responsibilities and was stuck in an adolescent stage of life. (Tr. 481.) During their next session, Plaintiff's father attended and

expressed concern that Plaintiff isolates himself in his room playing video games all day. (Tr. 491.) Plaintiff denied feeling down or depressed and stated he was content in his life and was "more reclusive and a loner." (*Id.*) After several more sessions of noting Plaintiff's lack of motivation to care for himself (Tr. 489, 490), Zaloudek referred Plaintiff to psychiatrist Dr. Leandrea Lamberton for a psychiatric evaluation (Tr. 494).

Dr. Lamberton suspected that Plaintiff had high functioning autism but would need neuropsychological testing to confirm this. (Tr. 496.) This testing was completed by Katie Brueggen, MS LMFT in November 2018. (Tr. 636–37.) Brueggen found that Plaintiff met the criteria for an autism spectrum disorder diagnosis and strongly recommended Plaintiff seek out support for navigating the diagnosis and related symptoms. (Tr. 510.) Brueggen specifically noted that Plaintiff would benefit from enhancing his social skills and understanding social norms. (*Id.*) She stated that an autism diagnosis indicated that Plaintiff demonstrated atypical behavior patterns in the areas of communication and reciprocal social interaction and that individuals with autism typically function best with highly structured daily schedules and predicable routines. (*Id.*)

Plaintiff continued to treat with Zaloudek until September 29, 2020. (Tr. 1056.) During the course of this treatment relationship, Plaintiff became "fixated" on online dating and finding a romantic relationship. (Tr. 1118.) Plaintiff blamed Zaloudek for not finding him a girlfriend. (Tr. 1072.) Zaloudek documented multiple instances of Plaintiff exhibiting inappropriate behavior towards her during treatment sessions, including questioning why she could not date him (Tr. 1067, 1112) and asking her to take pictures of him for an online dating profile and to complete a dating profile on his behalf (Tr. 1082). Zaloudek's records are replete with instances documenting Plaintiff's poor social interactions, including maintaining poor

eye contact (Tr. 487, 488, 491, 521–22), covering his face with his hand while speaking (Tr. 1097, 1120), and concrete and inflexible thinking (Tr. 1105, 1108, 1116, 1117, 1120). Zaloudek described Plaintiff's "communication style" as challenging or debating her. (Tr. 1067, 1070.) She stated Plaintiff lacked the ability to understand subtle social cues. (Tr. 1114.) At the conclusion of their treating relationship, Zaloudek stated that Plaintiff's concrete, inflexible thinking was an obstacle to treatment, though she "knew this would be an issue based on his diagnosis of autism." (Tr. 1056.) She stated that Plaintiff had difficulty seeing another person's perspective of situations; he could see things "only through his lens." (*Id.*)

During this timeframe, Plaintiff continued to treat with Dr. Lamberton for medication management. Dr. Lamberton similarly described Plaintiff's poor eye contact, noting on multiple occasions Plaintiff kept his hood pulled up and covered his face with his hand. (Tr. 525, 528, 546, 548.) Plaintiff's father attended an appointment in May 2019, and reported he frequently argued with Plaintiff, to which Dr. Lamberton explained that inflexible thinking is part of having autism. (Tr. 527.)

Further, based on her observations regarding Plaintiff's limitations, Zaloudek referred Plaintiff to the Aging and Disability Resource Center ("ADRC") to connect him with a case manager "who could assist with socialization, housing and possible job training skills." (Tr. 1061.) In Zaloudek's referral, she stated that Plaintiff needed help in many areas of life. (Tr. 570.) In March 2019, ADRC's case notes indicated that Plaintiff transitioned to living in his own apartment but with Comprehensive Community Services ("CCS") support for meal planning, preparation, and obtaining groceries. (*Id.*) The notes indicated that Plaintiff liked "to debate and argue" and that everything he did must "be on his terms." (*Id.*)

6

After ending treatment with Zaloudek, Plaintiff established a treating relationship with Kathleen George-Bol, LPC in October 2020. (Tr. 579.) He treated with George-Bol until January 2021. (Tr. 589.) During Plaintiff's intake appointment, Plaintiff again indicated that he wanted a girlfriend/romantic relationship. (Tr. 579.) George-Bol described Plaintiff as living quote-unquote "independently" as his father paid for his apartment and came over to clean multiple times per week. (Tr. 582.) George-Bol encouraged Plaintiff to seek out wrap around services from Inclusa[1] to assist him so that his father would have less responsibility caring for him. (*Id.*) In October, George-Bol opined Plaintiff's prognosis was "fair to good" if he could utilize the information and skills learned in therapy for relationships. (Tr. 631.)

Over the course of the next several months, however, George-Bol began noting similar issues as Zaloudek. Plaintiff wanted George-Bol to write an online dating profile for him (Tr. 629) and expressed frustration with the therapist's "lack of direct interaction in the dating process" (Tr. 620). In late November 2020, Plaintiff subjected George-Bol to an "irate tangent" regarding how she was not doing enough to get him a girlfriend. (Tr. 615.) In early January 2021, George-Bol noted that Plaintiff's frustration over not getting dates and struggling with dating websites culminated "in him breaking his glasses after struggling with the concept of personal accountability." (Tr. 597.) Plaintiff wanted George-Bol to cut his hair, dress him, and tell him exactly what to do to get a date. (*Id.*) George-Bol now stated Plaintiff's prognosis was fair to poor due to his unwillingness to spend his time and energy pursuing his therapy objectives outside of the treatment sessions. (*Id.*)

At their next appointment, George-Bol noted that Plaintiff was wearing his broken glasses and "only briefly" spoke "about his meltdown." (Tr. 593.) George-Bol explained that

---

[1] Inclusa is "a state certified Managed Care Organization designed to offer the Family Care program to eligible elders and adults with disabilities." https://www.inclusa.org/members-family/(last visited Mar. 16, 2026).

Plaintiff gets "overwhelmed and angry that things aren't going his way and then has temper tantrums." (Tr. 593–94.) George-Bol noted she was unsure whether Plaintiff could see his behavior from this point of view, as he again accused her of not doing enough to help him. (Tr. 594.) By the end of January 2021, George-Bol discontinued treatment with Plaintiff "due to lack of progress toward goals as well as main goals outside the scope of this therapist's knowledge and practice." (Tr. 589.) George-Bol suggested Plaintiff continue to work on social skills as well as healthy anger and communication, to which he responded by again voicing his displeasure at his lack of growth due to the therapist's alleged failings. (Tr. 590.)

On April 30, 2021, Plaintiff established care with Betty Thunder, LCSW. (Tr. 1246.) He treated with Thunder until August 27, 2021. (Tr. 1239.) During their initial session, Thunder noted that she had to explain "a lot of words [Plaintiff] could not conceptualize" due to his autism. (Tr. 1246.) She stated that his treatment goal was to get a girlfriend. (*Id.*) Thunder explained to Plaintiff that she cannot "go find him a girlfriend" but could help with self-confidence and self-esteem and discussed how autism gets in the way of social interactions. (Tr. 1245.) At Plaintiff's next appointment, Thunder noted that Plaintiff was "limited in his ability to understand what [her] role [was]." (Tr. 1243.) In May 2021, Thunder noted that she constantly had to redirect Plaintiff to his lack of self-care, as she noted that he looked very frail and thin and Plaintiff said that he refused to go to the store to buy food and was living on oatmeal and water. (Tr. 1242.) When Thunder stated she would have to call adult protective services to do a welfare check on him, he responded, "ok if [you] need to do that then do it" and was "obsessed about the girlfriend and wanting sex again today almost in an OCD form." (*Id.*)

In June 2021, Thunder noted her goal was to help Plaintiff really understand her boundaries and that she cannot "find" him a girlfriend. (Tr. 1241.) Thunder stated that Plaintiff's "autism prevents him at this point to be able to have full rounded conversations about what he needs to do. Instead of him trying to learn to take responsbility for getting a girlfriend he seems to think a therapist can literally get him a girlfriend." (*Id.*) Thunder further noted that Plaintiff had difficulty taking suggestions for his own self-improvement due to his autism. (Tr. 1240.) By August 2021, Thunder stated that Plaintiff either could not or was unwilling to continue treatment with her and "cannot take any direction at this point in his life." (Tr. 1239.) He appeared disheveled, his hair unkept, his pants extremely wrinkled, and looked very tired. (*Id.*)

Plaintiff established treatment with Kristin Metoxen, LPC on September 1, 2021. (Tr. 1238.) He treated with Metoxen for approximately two months. (Tr. 1231.) Metoxen noted that Plaintiff struggled with interpersonal relationships and was motivated to increase his skills so he could find a girlfriend. (Tr. 1236.) In early November 2021, Plaintiff presented as irritable and frustrated that Metoxen cannot "go out into public places to observe how he interacts with others and offer him feedback." (Tr. 1232.) Two weeks later, Plaintiff presented highly irritable and frustrated with services from all of his previous therapists, as well as with Metoxen. (Tr. 1231.) Metoxen noted that while Plaintiff wanted a girlfriend, he had limited tolerance for distress and could not leave his home without support. (*Id.*) Metoxen stated that Plaintiff was "laser focused" on wanting a girlfriend and for someone to facilitate this for him and was resistant to any discussion that there was no one script to follow to meet someone. (*Id.*)

9

Metoxen referred Plaintiff back to ADRC and an additional intake interview was conducted by Belinda Davidson in December 2021. (Tr. 564.) Davidson indicated that Plaintiff needed support in socializing and was awkward and paranoid during the screening interview. (Tr. 568.) Plaintiff was "suspicious of many questions" because he did not understand their relevance and Davidson "had to explain the purpose of several questions before he would answer." (*Id.*) Plaintiff also refused to provide more detail when asked specific questions and would talk about something random rather than answer the question, even when asked multiple times. (*Id.*) Davidson further described Plaintiff's behaviors during the screening interview as "very odd." (Tr. 570.) She described that upon entering the room, Plaintiff headed towards Davidson's chair to sit and when she instructed him to have a seat anywhere else at the table, he appeared very put out by the request. (*Id.*) At the end of the interview, Plaintiff was upset because Davidson would not allow him to sit in the room while she completed her work, asking him to instead wait in the waiting room. (*Id.*) Davidson explained Plaintiff made her feel uncomfortable while they were talking and believed he would work best with a male case manager. (*Id.*)

In January 2022, an ADRC caseworker made contact with Metoxen who noted that she informed Plaintiff she was leaving her office at the end of the month. (Tr. 1311.) She stated that she helped Plaintiff with many things and "most of the time he [was] rude and either call[ed] and then d[idn't] answer the phone for a callback or call[ed] and yell[ed] at whoever answer[ed]." (*Id.*)

After terminating treatment with Metoxen, Plaintiff attended one appointment with Emily Xiong, LMFT on May 20, 2022 (Tr. 663), two appointments with Mark Mixdorf, LCSW on May 31, 2022 and June 4, 2022 (Tr. 666, 1218), and one appointment with Blake

10

Burton, LPC on June 7, 2022 (Tr. 669). Xiong described Plaintiff as disheveled, hostile, and irritable (Tr. 663), while Mixdorf noted poor insight and poor judgment/impulse control (Tr. 666). Mixdorf stated that Plaintiff was clear that his main goal for therapy was help finding a girlfriend but Mixdorf explained that what he could do was discuss social anxiety or other issues he had when trying to talk to women. (Tr. 667.) Plaintiff, however, was adamant about his main goal, and argued with Mixdorf, quoting philosophical theories and ideas on how things should proceed. (*Id.*) Mixdorf struggled to get Plaintiff back on topic. (*Id.*) He described Plaintiff as very argumentative and uninterested in hearing what Mixdorf had to say. (*Id.*)

Burton noted that Plaintiff wanted help getting a girlfriend and when asked how he could help with this, Plaintiff stated Burton should review his dating profile and review his interactions with women in person. (Tr. 670.) Burton informed Plaintiff he could not do this, and Plaintiff asked for a referral to a therapist who could help him find a girlfriend. (*Id.*) When Burton stated that he did not know of anyone that would do this, the "session ended after [Plaintiff] explained the research he has done on dating and existentialist philosophy." (*Id.*)

Plaintiff's final therapist during the relevant period was Aimee Budleski, MS, LPC, with whom he treated from June 30, 2022 (Tr. 1375) until August 1, 2022 (Tr. 1374). At his initial appointment, Budleski noted Plaintiff appeared disheveled with an irritable mood, argumentative behavior, and constricted affect. (Tr. 1375.) Plaintiff indicated that he suffered from depression as a result of never having a date. (*Id.*) In July, Plaintiff was upset that he was required to complete forms and "was excessively argumentative and yelling at provider" and Budleski informed him that such behavior would not be tolerated in session. (*Id.*) During Plaintiff's final session with Budleski on August 1, 2022, he arrived at the office while talking to a friend on "3-pals." (Tr. 1382.) Plaintiff wanted to include this friend in his therapy session,

11

though Budleski informed him that without a release, she could not share information with this friend. (Tr. 1382–83.) Plaintiff then called this friend during the session and the friend stated that Plaintiff was not in a place for a relationship and should be focusing on other areas of life to be happy with. (Tr. 1383.) Plaintiff argued with his friend that the only way for him to be happy was to find a girlfriend. (*Id.*) While Budleski worked with Plaintiff on communication and how to listen to understand rather than listen to respond, Plaintiff felt the need to justify his beliefs and positions at all times with research and evidence. (*Id.*)

In her therapy termination note, Budleski stated that Plaintiff was significantly obsessed with the idea of finding a girlfriend and was not interested in working on himself at all. (Tr. 1388.) She stated that Plaintiff struggled with social interaction and basic communication skills, that no progress was made, and that it was unlikely that Plaintiff would benefit from traditional therapy services at this time. (*Id.*) On October 30, 2023, Budleski noted it was her clinical impression that Plaintiff was not "appropriate" for mental health therapy at this time as he refused to work on any strategies to address his mental health issues other than "getting a girlfriend" and was looking for a provider to give him dating advice and help with dating profiles. (Tr 1374.) Budleski stated that despite explaining the purpose and limits of therapy, Plaintiff struggled to accept and respect the boundaries of the treating relationship and would become verbally aggressive towards her, calling her stupid. (*Id.*) Plaintiff would also contact Budleski outside of session, with no emergency concern. (*Id.*) Thus, Budleski recommended as follows:

> Client would be appropriate for Long-term Disability, as well as extensive community supports including Adults CCS, ADRC and any other treatment options he would be eligible for. Client would also benefit from social skills training with other adults on the spectrum. An evaluation should be performed to determine competency, and to explore any needs for guardianship or power of attorney.

(*Id.*)

### 2.2 Consideration of Autism Limitations in RFC

ALJ Hodgson concluded that a limitation to frequent interactions with supervisors, co-workers, and the public sufficiently accounted for Plaintiff's limitations in social interactions. This conclusion is not supported by the record evidence. In finding Plaintiff had only moderate limitations in the "paragraph B" criteria of interacting with others, the ALJ noted that Plaintiff was able to go out on his own, that despite presenting as irritable he was also described as pleasant and cooperative, and that he showed only minor impairment with communication, i.e., slow speech. (Tr. 36.)

In discounting Plaintiff's statements regarding the severity of his limitations with social interactions, ALJ Hodgson found that "the record evidence does not support [an] inability to socialize." (Tr. 38.) She found that nothing in the medical records indicated that Plaintiff's fixation on having a romantic relationship was related to autism. (*Id.*) The ALJ further found that while the records showed Plaintiff was irritable and hostile at times, there were no reports of violence, yelling, or law enforcement involvement. (Tr. 42.) ALJ Hodgson also pointed to Plaintiff's August 2022 reference to trying rock climbing, biking, dancing, volunteering, community band, and music as activities that "suggest higher level of functioning than those alleged by the claimant" and that "the claimant's statement that they had tried all these things suggests high[er] levels of social functioning than alleged." (Tr. 41.)

Review of the record as a whole belies the ALJ's conclusions. To begin with, the record frequently documents Plaintiff's inability to interact appropriately with others. In fact, a review of Plaintiff's behavior during his many therapy sessions over multiple years provides the clearest picture of this. While ALJ Hodgson acknowledges that Plaintiff had difficulty

accepting and respecting boundaries with his therapists (Tr. 40), she minimizes the overarching picture of just how inappropriate Plaintiff's social interactions were as a whole. Plaintiff continually made inappropriate requests of his therapists, such as asking them to write a dating website profile for him (Tr. 624, 1082), to accompany him in public to observe his interactions with women and give him feedback (Tr. 670), and even propositioning Zaloudek for a date on two occasions (Tr. 1067, 1112). This prompted Zaloudek to aptly note that Plaintiff had difficulty understanding the boundary line between a personal and professional relationship. (Tr. 1067.) Thunder similarly observed that Plaintiff was limited in his ability to understand what exactly the therapist's role was. (Tr. 1243.) And when questioned about these actions during the administrative hearing, Plaintiff seemed completely unaware of why this behavior was inappropriate. (Tr. 80–81, 84–85.)

Plaintiff's therapists also documented his lack of understanding of appropriate social interactions outside of the professional therapy relationship. Thunder explained how she was trying to "get [Plaintiff] to grasp that he must do footwork, such as working on his hygiene, getting out of his apartment, learning how to talk to a girl, [and] teaching him that objectifying women for sex only will more than likely not get him a girlfriend." (Tr. 1241.) Thunder noted that Plaintiff struggled "with following or even taking suggestions of writer to enhance his skills to become more social." (*Id.*) Multiple providers noted that Plaintiff had limited insight into how to interact with peers. (Tr. 509, 1099, 1103, 1232.) As Zaloudek once observed, "social interactions are difficult for [Plaintiff] and perplex him." (Tr. 1118.)

Beyond Plaintiff's inability to interact appropriately with his therapists and his therapists' observations regarding his inability to interact properly with his peers, the record documents other instances of Plaintiff's inability to socialize appropriately. Davidson

14

documented Plaintiff's "odd behaviors" during the December 2021 ADRC screening interview. Again, as cited above, Plaintiff tried to sit in Davidson's chair and became upset when she asked him to sit in any other chair at the table, he refused to answer questions without first knowing their relevance, and he became upset when he was not allowed to stay in the room with Davidson after the interview was complete. (Tr. 570.) Davidson noted that Plaintiff made her feel uncomfortable while they were talking and believed he should not be paired with a female case manager. (*Id.*) Another case worker documented a telephone call in which Plaintiff accused her of doing nothing to help him reach his goal of getting a girlfriend and became angry when she explained that professional boundaries prevented her from going out to the bars with him to help him find a girlfriend. (Tr. 1308.) Plaintiff ended their telephone call by stating "I'm done with you" and hanging up. (*Id.*)

Next, the record supports that autism is characterized by inflexible thinking and a preoccupation on a narrow subject range, such as Plaintiff's fixation on finding a girlfriend. Multiple providers noted that Plaintiff exhibited inflexible thinking, difficulty seeing other's points of view, and a "laser focus" on finding a girlfriend as part of having autism. (Tr. 527, 1056, 1231, 1242.) Zaloudek documented an instance where Plaintiff refused to leave her office at the end of their therapy session because he "was determined to stay in the office until [Zaloudek] solved his lack of having a girlfriend." (Tr. 1102.) In other words, the record supports a link between Plaintiff's autism and his preoccupation with finding a romantic relationship, contrary to ALJ Hodgson's assertion.

Next, ALJ Hodgson's finding that the record contains no reports of violence, yelling, or law enforcement involvement (Tr. 42) is simply incorrect. During a treatment session with Zaloudek in which Plaintiff's father participated, he described a recent incident where Plaintiff

15

got into a disagreement with his stepmother regarding Plaintiff's lack of contribution to the household. (Tr. 1108.) He explained that Plaintiff called the police stating that his stepmother was emotionally and verbally abusing him; however, he stated that Plaintiff was "lucky he didn't get arrested for disorderly with his [stepmother]" as Plaintiff was throwing things around the house. (*Id.*) George-Bol documented Plaintiff throwing a "temper tantrum" during a therapy session while struggling to deal with the concept of personal accountability that culminated in him breaking his glasses. (Tr. 593, 597.) Both Metoxen and Budleski stated that Plaintiff had yelled at them (Tr. 1311, 1375) and Budleski described Plaintiff becoming verbally aggressive toward her and calling her "stupid" (Tr. 1374).

Further, ALJ Hodgson cites to an August 2022 record in which Plaintiff "referenced trying rock climbing, biking, dancing, volunteering, community band, and music" as evidence suggesting higher levels of social functioning than alleged. (Tr. 41.) This record, however, needs to be placed in its proper context. After Plaintiff's final therapy session with Budleski on August 1, 2022, he sent her the following email that evening:

> you can cancel my next session. I don't think you're a good therapist, i'm literally going crazy doing the same thing over and over again, i've tried doing different things, i'm lonely going on 26 years old without anyone, so fuck you, i'm getting a different therapist. why the fuck would going rock climbing, biking, dancing, volunteering make me feel better in the first place, i've tried all those thigns [sic]. community band, music, i'm done being lonely so fuck you and you're [sic] advice, i'm getting a different therapist.

(Tr. 1383.) Given the tone and context of this message, it is unclear Plaintiff has, in fact, tried such activities as dancing and rock climbing. It sounds more like Budleski made several suggestions of social activities to try and he angrily retorted that he has "tried all those things" to no avail. And as to volunteering, band, and bike riding, the record does indicate that Plaintiff tried these things. However, it is unclear how this supports the ALJ's conclusion.

Plaintiff briefly volunteered at the humane society to "meet girls" but quit when he failed to meet anyone. (Tr. 1219.) Plaintiff subsequently continually rebuffed the idea of volunteering. (Tr. 624, 1086.) While the record notes Plaintiff rode his bike, he did so instead of driving when he needed food (Tr. 1076), not as a social activity. And while the record indicates that Plaintiff played trumpet in a community band and played "taps" for military services in the past (Tr. 1105, 1290) there is no indication that he continued to do so during the relevant period. Thus, Plaintiff's brief (and highly inappropriate) statement to his therapist regarding activities he has "tried" does little to undermine Plaintiff's asserted deficiencies in social functioning.

ALJ Hodgson relies on this same evidence to reject multiple medical opinions opining Plaintiff is more severely limited in social interactions than the ALJ found. On January 3, 2019, at the initial level, State Agency consultant Dr. Frank Orosz opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public, supervisors, and co-workers and found that he would do best in a job that does not require frequent contact with the general public and only superficial interactions with co-workers and supervisors. (Tr. 135.) At the reconsideration level, on August 20, 2019, State Agency consultant Dr. Russell Phillips similarly opined that Plaintiff was moderately limited in his ability to interact appropriately with the public, supervisors, and co-workers, and opined Plaintiff would not be able to tolerate sustained contact with the public. (Tr. 147.) ALJ Hodgson found both State Agency consultants' opinions unpersuasive. In rejecting Dr. Orosz's findings, the ALJ again cited to evidence that Plaintiff was described as pleasant and cooperative at times, Plaintiff's statement that he was never fired for inappropriate behavior or interactions, and no reports of violence in the record. (Tr. 42.) But for the reasons explained above, this finding is not

supported by the record. While Plaintiff may have been described as pleasant and cooperative at times, these citations are plucked out of a myriad of records showing irritability and inappropriate behavior. Further, Plaintiff demonstrated violent actions both in the argument with his stepmother and in breaking his glasses during a therapy session. And while he may not have been fired for inappropriate behavior, that is likely reflective of the fact Plaintiff has little to no work history. He certainly was discharged as a patient, though, by multiple therapists for his inappropriate behavior.

The ALJ also rejects both consultants' opinions because Dr. Orosz did not define "superficial interactions" and Dr. Phillips did not define "sustained contact." (Tr. 42–43.) While it is true that the term "superficial" is undefined in any relevant agency materials, *Schmidt v. Kijakazi*, No. 21-CV-0319-BHL, 2022 WL 17584173, at *3 (E.D. Wis. Dec. 12, 2022), in this case, Dr. Orosz cites to the records showing Plaintiff's difficulty relating socially and somewhat limited responsiveness to social interactions (Tr. 133). Thus, it appears Dr. Orosz uses the plain meaning of "superficial," meaning "the absence of substance." *Schmidt*, 2022 WL 17584173, at *3. This conclusion is well-supported by the record. Again, Zaloudek noted that Plaintiff had difficulty communicating because he wants to "debate versus being in a conversation." (Tr. 1118.) Given Plaintiff's inflexible thinking, limiting his interactions with co-workers and supervisors to only superficial ones (i.e., ones lacking in substance), would lessen the opportunity to cause conflict or debate. Dr. Phillips' opinion that Plaintiff cannot tolerate "sustained contact with the public" similarly evokes the plain meaning of "sustained" which is "maintained at length without interruption or weakening: lasting, prolonged." https://www.merriam-webster.com/dictionary/sustained (last visited Mar. 16, 2026). Again, given Plaintiff's inability to interact appropriately with others as demonstrated

in the record, avoiding prolonged interaction with the general public would account for this limitation.

Dr. Lamberton opined that Plaintiff was completely incapable of responding appropriately to supervisors and co-workers (Tr. 516) due to his "concrete, illogical thinking secondary to autism" (Tr. 515). Steven Kuhn MS, LPC-SAS opined that Plaintiff had marked limitations in interacting appropriately with supervisors and co-workers and moderate limitations in interacting with the public. (Tr. 1370.)[2] Kuhn stated as support for this opinion "interactions in counseling sessions and self-report." (*Id.*) ALJ Hodgson found Dr. Lamberton's opinions unpersuasive and inconsistent with the medical evidence of record (Tr. 41), noting that Plaintiff was never fired for inappropriate behavior, had no reports of violence, yelling, or law enforcement involvement, and showed responsiveness to most social contexts during Brueggen's November 26, 2018 evaluation (Tr. 42). The ALJ similarly rejected Kuhn's opinion because of Brueggen's evaluation and due to the referenced activities of community band, biking, driving, volunteering, and video and computer games. (Tr. 43.)

Again, for the reasons already explained, ALJ Hodgson's rejection of these opinions is unsupported by the record evidence. Furthermore, it is entirely unclear how Plaintiff's stated activities of playing video and computer games, biking, and driving supports that he is not as limited as alleged in interacting with others. (Tr. 43.) Plaintiff played video games alone in his room, not in-person with others. (Tr. 490.) Nor does the evidence reflect he rode his bike or drove his car in tandem with others when he did do those things.

---

[2]Although neither party nor ALJ Hudgson address this issue, I cannot find any treatment records from Steven Kuhn MS, LPC-SAS in the record. His medical opinion is dated October 5, 2023; however, the form does not indicate when Kuhn began treating Plaintiff. After Plaintiff's treating relationship with Budleski ended in August 2022, Plaintiff requested a referral for a new counselor during a visit with PA Angela Buchman on May 5, 2023. (Tr. 1427.) I can only assume Plaintiff treated with Kuhn sometime between May and October 2023; however, there are no treatment notes from Kuhn in the administrative record.

Furthermore, while ALJ Hodgson cites several of Budleski's treatment records as well as her opinion that Plaintiff did not appear to be appropriate for mental health counseling at this time (Tr. 40), she fails to address Budleski's recommendations, including that Plaintiff would be "appropriate for long-term disability as well as extensive community supports" and that he would "benefit from social skills training." (Tr. 1391.) Budleski recommended Plaintiff be evaluated to determine competency and explore the need for guardianship or power of attorney. (*Id.*) In other words, while Budleski renders a rather severe opinion, it is consistent with both her treatment records and with the other medical opinions and treating records on file. ALJ Hodgson does not consider Budleski's recommendations.

The Commissioner argues that even if the ALJ should have found greater social restrictions than those assigned, any error is harmless because she ultimately concluded that Plaintiff could perform multiple jobs, including car detailer, which requires no interaction with co-workers and the general public and only occasional interaction with supervisors. (Docket # 14 at 9.) Further, the VE testified that there were approximately 35,152 car detailer jobs in the national economy, which is more than enough to constitute a significant number. (*Id.*) I am unconvinced, however, that the ALJ's decision is saved by harmless error. The VE testified that a person is required to interact appropriately with his supervisor one hundred percent of the time and if he cannot accept criticism from a supervisor, the person is more suited to sheltered employment or having a job coach than to competitive work. (Tr. 94–95.)

The record certainly supports Plaintiff's inability to take criticism. Multiple treating providers indicated Plaintiff exhibited inflexible, illogical thinking. Zaloudek, with whom Plaintiff treated with the longest, noted that his communication style consisted of debating and arguing. Plaintiff did not react appropriately when his providers, his family, or his case

workers told him something he did not want to hear. Thus, it seems highly unlikely even occasional interaction with a supervisor would accommodate his limitations. Indeed, the record supports the idea that Plaintiff requires sheltered employment or a job coach, with Inclusa noting that Plaintiff's concrete thinking and inability to manage proper interactions with people due to his autism has caused employment issues in the past and "[i]f employed, it is likely that [Plaintiff] would need regular supports, specifically related to helping him learn and manage relationships and proper interactions in a work place setting." (Tr. 1183.)

While Plaintiff raises several other issues with the ALJ's findings, given the pervasiveness of the ALJ's error in assessing Plaintiff's ability to interact appropriately with others, I will not address these alleged errors further.

## CONCLUSION

ALJ Hodgson's conclusion that Plaintiff is capable of frequent interaction with supervisors, co-workers, and the public is unsupported by the evidence of record. Thus, remand is required for the ALJ to re-evaluate Plaintiff's RFC.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of March, 2026.

BY THE COURT:

_____

NANCY JOSEPH
United States Magistrate Judge